UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BORGWARNER DIVERSIFIED TRANSMISSION PRODUCTS INC., <br><br> Plaintiff, <br><br> v. <br><br> UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, LOCAL NO. 287; and GERALD POOR; WILLARD L. SLOAN; EUGENE J. WINNINGHAM; BOB L. BERTRAM; JAMES L. KELLEY; JIM BARRETT; LARRY BRADBURN; JAMES A. CLARK; JOHN W. FENNIMORE; EARL F. HERRON; RALPH K. SMITH; LARRY TERRELL; MAX VAN ULZEN; DORAN C. KENDALL; TERRY GARRIOTT; KEITH MOSES; DON HOBBS; JOHNNY MASSEY; and BOBBY GUESS individually and as the representatives of a defendant class, <br><br> Defendants. | Case No. 1:06-cv-0058-LJM-WTL |

**PLAINTIFF DTP'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff, BorgWarner Diversified Transmission Products Inc. (DTP), pursuant the the parties' Second Amended Case Management Plan, submits its proposed findings of fact and conclusions of law for purposes of trial in this matter.

### I.   FINDINGS OF FACT

1.  DTP has its principal place of business and only plant in Muncie, Indiana.

2.  It is a tier-one supplier to the automotive industry, manufacturing transfer cases for four-wheel drive vehicles and currently employing approximately 650 individuals.

3.  Its hourly non-management workforce (except for the plant guards and certain

clerical employees) is currently and has at all times relevant to this action been represented by Local 287 and the International Union, United Automotive, Aerospace and Agricultural Implement Workers of America (collectively "Union").

4.      On January 10, 2006, DTP notified certain of its post-October 27, 1989 hourly retirees and the Union of its intent to modify the retirees' health care benefits.

5.      DTP mailed the notice to retirees and hand-delivered it to the Union.

6.      DTP explained in its letters that the changes were necessary "to give the Muncie plant the chance to compete in today's difficult business environment." (Trial Exs. 1, 2).

7.      DTP further explained:

> When we evaluated our retiree health care plans for BorgWarner Diversified Transmission Products Inc. ("Muncie DTP"), it was clear that the plans were not competitive. The company cost for health care coverage for Muncie DTP retirees is far greater than the cost born [sic] by our competitors. Today, we spend an average of over $17,000 per retiree for medical and prescription drug coverage for Muncie pre-Medicare retirees. This compares with an automotive supplier average of just over $11,000 and a national average of just under $9,000. In total, the Muncie plant will spend almost $19 million on retiree health care benefits in 2005. At the same time, the business climate for Muncie has experienced dramatic changes. Sales of light trucks and sport-utility vehicles that use our transfer cases have seen double digit decreases in 2005. Ford Explorer sales alone were down over 30%. We expect the market for our transfer case products to continue to decline. It is this challenging business situation that has made it necessary to make changes to your retiree health care plan to more competitive levels.

(*Id.*).

8.      For those retiring between January 1, 1993 and April 23, 2005, the changes became effective April 1, 2006.

9.      For those retiring between October 27, 1989 and December 31, 1992, the changes became effective October 1, 2006.

10.     DTP's Board of Directors unilaterally instituted the modifications.

11.     The changes DTP implemented are summarized in charts attached to the notices.

12. During the relevant time period, DTP and the Union memorialized agreements relating to health care, called "Health Insurance Agreements" ("HIA"), separately from the collective bargaining agreements ("CBA") governing economics and work rules.

13. The 1989 HIA stated:

> The Company now has in effect a group insurance policy with the Equitable Life Assurance Society of the United States ("Equitable") which provides for employee life insurance, dependent life insurance, transition & bridge, accidental death and dismemberment, accident and sickness, basic hospitalization/surgical/medical, prescription drug, major medical, substance abuse, vision, human organ/tissue transplant, hearing and dental coverages under the Plan. *During the period of this Agreement* the Company will renew said group insurance policy or will obtain from Equitable Life Assurance Society of the United States, its successor or another insurance company or companies of comparable standing (the "Insurance Company"), a new group insurance policy. . . .

(Trial Ex. 4, Art. II, p. 4) (emphasis added).

14. "Agreement" in the 1989 HIA was defined in the preamble to refer to the "Health Insurance Agreement entered into this 27th day of October, 1989 (the "Agreement")[.]" (*Id.*, p. 4).

15. In Article XII, the HIA defined the period of the Agreement as October 27, 1989 to September 12, 1992 and provided for the Agreement's termination or modification as follows:

> This Agreement and the Plan embodied herein shall become effective as of October 27, 1989, and continue in full force and effect until September 12, 1992. During the term of this Agreement neither the Company nor the Union shall demand any change in this Agreement nor shall either party be required to bargain with respect to this Agreement, nor shall there be any strike or lockout or other exercise of economic force or threat thereof by either party hereto against the other party for the purpose of effecting or attempting to effect by use of some other demand or otherwise a change in or addition to any feature or provision of this Agreement except as may be herein otherwise specifically provided.
>
> On September 12, 1992 this Agreement may be *terminated, modified, changed or continued* in the same manner as provided in Article Sixteen of the aforesaid Collective Bargaining Agreement between the parties hereto dated October 27, 1989.

3

(*Id.*, p. 15) (emphasis added).

16. The 1989 CBA Article Sixteen, which by its incorporation controlled the termination or modification of the 1989 HIA, read:

> Section I Duration
>
> This Agreement shall remain in full force and effent [sic] until September 12, 1992 and thereafter from year to year, unless either party shall give notice in writing at least sixty (60) days in advance of September 12, 1992, or any anniversary thereafter of its desire to terminate the Agreement.
>
> Section II Modification
>
> If either party desires to modify the terms of this Agreement it shall notify the other party in writing, at least sixty (60) days prior to September 12, 1992 or sixty (60) days prior to any anniversary thereafter, setting forth the provisions to be modified.
>
> These modifications or proposed changes as set out in the notice given by either party, or both, will be the only subjects for discussion during the negotiations and when modifications are agreed upon the modified contract will continue in full force for the ensuing year and thereafter unless further modified or terminated on an anniversary date.
>
> It is mutually agreed between the parties hereto that, if after giving of the sixty-(60) day notice to modify the contract and no agreement is reached by the anniversary date of the contract, the Union shall have the right to strike to obtain said modifications and any such strike will not be considered a breach of any of the other terms or conditions of said contract.

(Trial Ex. 5, Art. 16, pp. 141-42).

17. While the HIA incorporated by reference Article Sixteen of the 1989 CBA, the 1989 CBA made no reference to the existence of the 1989 HIA, the health insurance benefits provided under it, or the duration of any health insurance benefits provided to retirees.

18. Article VIII of the 1989 HIA explicitly stated that the benefits provided to retirees, their surviving spouses, and dependants included only those benefits outlined in Exhibits A, C, D, E, F, and H to the 1989 HIA. (*See*, *e.g.*, Trial Ex. 4, Art. VIII, §§ 1, 3, pp. 7-9).

19. While Article VIII did not address the duration of retiree benefits, Exhibit A included a "Termination of Coverages" provision, which stated, in pertinent part, that "[t]he coverages provided under this Exhibit A terminate on the date that . . . the Agreement is terminated." (*Id*., Ex. A, Sec. II, Part M, subpart 2(e), pp. 65-66).

20. Exhibits C, D, E, F, and H all incorporated by reference Exhibit A's termination provision. (*Id*., Ex. C, Sec. I, B., p. 70: "Coverage under this Exhibit C terminates on the date that the coverages under Exhibit A, Section II terminate pursuant to Exhibit A, Section II M 2."; Ex. D, Sec. VI, A, p. 77 (same); Ex. E, Sec. V, A. pp. 79-80 (same); Ex. F, Sec. IV, A, p. 84 (same); Ex. H, Sec. III, A, p. 90 (same)).

21. The 1989 HIA's summary plan description contains a reservation of rights clause:

FUTURE OF THE PLAN

Although Borg-Warner Automotive Diversified Transmission Products Corporation, Muncie Plant expects and intends to continue the Plan indefinitely, it *reserves the right to modify, amend, suspend or terminate* the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement.

An individual's insurance coverage terminates when that person is no longer eligible or when the Group Insurance Policies terminate, whichever happens first. Additional information regarding termination of insurance policies and individual coverage is provided in the Health Insurance Agreement.

(*Id*., p. 121).

22. Laura Hess of UAW International reviewed the summary plan description before the 1989 HIA was signed and did not change the reservation of rights clause, although she suggested changes to other parts of the summary plan description.

23. In 1990, the Company and the Union negotiated the "Agreement on Modification and Extension of Existing Labor Contract (ACME)," signed September 27, 1990.

24. The ACME extended the 1989 CBA through March 11, 1995.

5

25. The ACME also extended the 1989 HIA through March 11, 1995, while establishing, via a Letter of Agreement, a joint task force to address DTP's post-retirement benefit ("PRB") liabilities.

26. The letter described the task force's charge as follows:

> The task force will develop, for consideration if possible, alternatives for solving the PRB Liability issue not effecting [sic] current retirees to be presented to the parties on or before September 1, 1991, with the implementation of any solutions mutually agreed upon and ratified by the membership of UAW Local 287 to coincide with a labor contract extension but no later than September 11, 1992.

(Trial Ex. 6, Ex. 3).

27. The letter also described the Union's and the Company's position on current retiree health insurance rights:

> This agreement does not prejudice the union's position that current retirees have life-time vested benefits nor the DTP Muncie Plant's position that current retirees do not have lifetime vested benefits.

(*Id.*).

28. Out of the task force came the "1992 Agreement on Modification and Extension of Existing Health Insurance Agreement and Ancillary Matters" ("1992 Health Care and PRB Agreement") and a new HIA dated November 30, 1992, which superseded the 1989 HIA.

29. As in the 1989 HIA, Article II of the 1992 HIA stated: "During the period of this Agreement the Company will renew said group insurance policy . . . ." (Trial Ex. 8, Art. II, Sec. 1, p. 1).

30. "Agreement" is defined in the preamble as "[t]his Health Insurance Agreement entered into this 30th day of November, 1992 (the "Agreement")[.]" (*Id.*, p. 1).

31. Identical to the 1989 HIA, Article XII of the 1992 HIA defined its effective period by dates certain and explained how and when it may be terminated or modified, again incorporating Article Sixteen of the 1989 CBA. (*Id.*, Art. XII, p. 14).

32. Article XII of the 1992 HIA also included a new provision relating to deductibles and stop-loss limits that survived the termination of the Agreement; the pertinent portion read:

> Section 2. Any provision in this Agreement or any Exhibit attached hereto relating to deductibles and Stop-Loss limits *shall survive termination of this Agreement.* Such provisions shall terminate on December 31, 2002 unless previously modified and/or extended.

(*Id*., Art. XII, p. 14) (emphasis added).

33. As before, Article VIII of the 1992 HIA established that the retirees were limited to the benefits provided in Exhibits A, C, D, E, F, and H.

34. Again, while Article VIII was silent on duration, Exhibit A included identical termination provisions as in the 1989 HIA: "The coverages provided under this Exhibit A terminate on the date that . . . the Agreement is terminated." (See *Id*., Ex. A, Sec. II, Part L, subpart 2(e), pp. 72-73).

35. The remainder of the exhibits applicable to retirees in the 1992 HIA adopted Exhibit A's termination provision. (*Id*., Ex. C, Sec. I, B., p. 78; Ex. D, Sec. VI, A, p. 86; Ex. E, Sec. V, A, p. 89; Ex. F, Sec. IV, A, pp. 93; Ex. H, Sec. III, A, p. 99).

36. In its summary plan description information, the 1992 HIA contained a "Future of the Plan" clause identical to that contained in the 1989 HIA, reserving DTP's right to "modify, amend, suspend or terminate the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement." (*Id*., p. 130).

37. While the benefits for those retiring prior to January 1, 1993 remained essentially the same, the 1992 HIA instituted a mandatory prescription mail order program for all retirees.

38. The 1989 CBA, which was extended by the 1990 ACME, expired March 11, 1995.

39. The parties negotiated a new CBA dated March 12, 1995.

40. The 1992 Heath Care and PRB Agreement had extended the 1992 HIA through March 11, 1998, but specifically allowed health care issues to be presented by the Union during the 1995 negotiations.

41. Due to changes negotiated during the 1995 collective bargaining, a new Health Insurance Agreement was drafted in 1995, which superseded the 1992 HIA.

42. As in the prior two HIA's, Article II of the 1995 HIA stated: "During the period of this Agreement the Company will renew said group insurance policy . . . ." (Trial Ex. 10, Art. II, Sec. 1, p. 1).

43. "Agreement" was defined within the preamble to mean "[t]his Health Insurance Agreement entered into this 12th day of March, 1995 (the "Agreement")." (*Id.*, p. 1).

44. Article XII established the HIA's effective period as March 12, 1995 to March 12, 1998, stating that "[o]n March 12, 1998 this Agreement may be terminated, modified, changed or continued in the same manner as provided in Article Sixteen of the aforesaid Collective Bargaining Agreement between the parties hereto dated March 12, 1995." (*Id.*, Art. XII, p. 14).

45. Article Sixteen of the 1995 CBA, incorporated by reference, reads:

Section 1 - Duration

This Agreement shall remain in full force and effect until March 12, 1998 and thereafter from year to year, unless either party shall give notice in writing at least sixty (60) days in advance of March 12, 1998, or any anniversary thereafter of its desire to terminate the Agreement.

Section 2 - Modification

If either party desires to modify the terms of this Agreement it shall notify the other party in writing, at least sixty (60) days prior to March 12, 1998 or sixty (60) days prior to any anniversary thereafter, setting forth the provisions to be modified.

These modifications or proposed changes as set out in the notice given by either party, or both, will be the only subjects for discussion during the negotiations and when modifications are agreed upon the modified contract will continue in full

8

>    force for the ensuing year and thereafter unless further modified or terminated on an anniversary date.
>
>    It is mutually agreed between the parties hereto that, if after giving of the sixty- (60) day notice to modify the contract and no agreement is reached by the anniversary date of the contract, the Union shall have the right to strike to obtain said modifications and any such strike will not be considered a breach of any of the other terms or conditions of said contract.

(Trial Ex. 9, Art. Sixteen, pp. 124-125).

46. As with the 1989 CBA, the 1995 CBA made no reference to the existence of the 1995 HIA, the health insurance benefits provided under it, or the duration of any health insurance benefits provided to retirees.

47. Article XII of the 1995 HIA continued to state that provisions relating to deductible and stop-loss limits would survive the termination of the agreement.

48. Article VIII of the 1995 HIA again addressed current and future retiree benefits and eligibility; as consistent throughout the HIAs, the retirees were limited to the benefits provided in Exhibits A, C, D, E, F, and H.

49. Exhibit A included identical termination provisions as in the 1989 HIA and 1992 HIAs, stating that coverages would terminate when the Agreement terminated.

50. The other exhibits outlining retiree benefits incorporated Exhibit A's termination provisions.

51. The 1995 HIA, in its summary plan description information, contained the same reservation of rights clause stated in the 1989 and 1992 HIAs, wherein DTP reserved its right to "modify, amend, suspend or terminate the Plan or the Group Policies therein in accordance with the provisions of the Health Insurance Agreement." (Trial Ex. 10, p. 132).

52. The parties negotiated another CBA in 1998.

9

53. While agreements were reached with respect to health insurance, no new HIA was drafted.

54. A booklet entitled "Borg-Warner Automotive Diversified Transmission Products Corporation, Muncie Plant & Local 287, UAW Insurance Highlights of the 1998 Contract Negotiations," was issued.

55. The 1995 HIA remained in effect, as modified by the 1998 Insurance Highlights.

56. The 1998 Insurance Highlights contained a reservation of rights clause different from that contained in the 1995 HIA:

> Although Borg-Warner Automotive Diversified Transmission Products Corporation, Muncie Plant expects and intends to continue the Plan indefinitely, it reserves the right, *subject to the terms of any existing Collective Bargaining Agreement*, if any, between the Company and Union, to *modify, amend, suspend or terminate the Plan or the Group of Policies in whole or in part, at any time*, and for any reason by action of either its Board of Directors or a person designated by resolution of such Board of Directors.
>
> An individual's insurance coverage terminates when that person is no longer eligible or when the Group Insurance Policies terminate, whichever happens first. Additional information regarding termination of insurance policies and individual insurance coverage is provided in the Health Insurance Agreement.

(Trial Ex. 12, p. 17) (emphasis added).

57. While benefits for those retired as of the 1998 Insurance Highlights remained essentially the same, prescription drug co-pays increased for any retiree participating in the PPO plan.

58. The mental health and substance abuse benefits were combined into one common plan for all retirees.

59. Although the 1998 CBA was set to expire on March 12, 2001, the parties engaged in early negotiations at the end of 2000.

10

60. The parties entered into a new CBA on December 10, 2000, set to expire March 12, 2006.

61. While agreements regarding health insurance were reached, no 2000 HIA was drafted.

62. Rather, the parties memorialized their agreement in an unsigned document entitled "Tentative Agreement on Insurance's [sic] and Pensions 11/28/00."

63. Thus the 1995 HIA remained in effect, as modified by the 1998 Insurance Highlights and the 2000 Tentative Insurance Agreement.

64. While the 2000 CBA was set to expire March 12, 2006, the parties again engaged in early negotiations in 2005.

65. The parties agreed to a new CBA, effective April 24, 2005.

66. While the 2005 CBA has been ratified, it has not yet been signed.

67. As before, the 2005 CBA was silent on the existence of an HIA and did not cover health insurance benefits applicable to actives or retirees.

68. Its Article Sixteen language (now moved to Article Fifteen) remained the same as prior CBAs':

Section 1 - Duration

This Agreement shall remain in full force and effect until April 24, 2009 and thereafter from year to year, unless either party shall give notice in writing at least sixty (60) days in advance of April 24, 2009, or any anniversary thereafter of its desire to terminate the Agreement.

Section 2 - Modification

If either party desires to modify the terms of this Agreement it shall notify the other party in writing, at least sixty (60) days prior to April 24, 2009 or sixty (60) days prior to any anniversary thereafter, setting forth the provisions to be modified.

> These modifications or proposed changes as set out in the notice given by either party, or both, will be the only subjects for discussion during the negotiations and when modifications are agreed upon the modified contract will continue in full force for the ensuing year and thereafter unless further modified or terminated on an anniversary date.
>
> It is mutually agreed between the parties hereto that, if after giving of the sixty- (60) day notice to modify the contract and no agreement is reached by the anniversary date of the contract, the Union shall have the right to strike to obtain said modifications and any such strike will not be considered a breach of any of the other terms or conditions of said contract.

(Trial Ex. 15, Art. Fifteen, pp. 116-117).

69. Any agreements regarding health care were memorialized in a series of documents entitled, "Tentative Agreement Modified and Approved by the Company: April 5, 2005," "Clarifications of Tentative Agreement Reached Between BWDTPC and UAW Local 287 April 8, 2005," and "UAW Local 287 Tentative Agreement of the 2005 Negotiations."

70. No new HIA was drafted.

71. Thus, the 1995 HIA remained the operative document, as amended by the 1998 Insurance Highlights, 2000 Tentative Insurance Agreement, and 2005 Tentative Agreements.

72. The agreements (or lack thereof) reached with respect to health care benefits for active employees are the subject of a lawsuit filed by the Union on February 27, 2007, Cause No. 1:07-cv-0262-LJM-TAB.

## II. CONCLUSIONS OF LAW

1. Absent a contractual obligation, "employers are 'generally free . . . for any reason at any time, to adopt, modify or terminate welfare plans,'" including the health care benefit plans at issue here. *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).

2. Because employers are not legally required to vest health insurance benefits, courts will only find an intent to vest where there is "clear and express language" regarding the

same in the contracts at issue. *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka, & Santa Fe Ry. Co.*, 520 U.S. 510, 515 (1997) ; *see also Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632 (7th Cir. 2004) (stating that "a modification that purports to vest welfare benefits must be contained in the plan documents and must be stated in clear and express language").

   3. Only when a court finds patent or latent ambiguity will extrinsic evidence be allowed to establish the meaning of the agreements. *Rossetto v. Pabst Brewing Co., Inc.*, 217 F.3d 539, 547 (7th Cir. 2000);  *Vallone*, 375 F.3d at 632-33 ("If there is some ambiguity in the language of the written agreement that is not disambiguated elsewhere in the document, only then may we consider evidence of the parties' intent that is "extrinsic" to the written documents, such as oral representations.").

   4. The contract language should be read "in an ordinary and popular sense, construed as if by a person of average intelligence and experience." *Bland*, 401 F.3d at 784 (quotation omitted).

   5. Under the express terms of the HIAs, retiree health insurance benefits are limited to the duration of the agreements and are thereafter subject to modification or termination.

   6. Each of the HIAs in question expressly limits its obligations to the duration of the Agreement. (*See* 1989 HIA, Art. II, Sec. 1, p. 4: "*During the period of this Agreement*, the Company will renew said group insurance policy . . . ." (emphasis added); 1992 HIA, Art. II, p. 1 (same); 1995 Art. II, Sec. 1, p. 1 (same)).

   7. The "period of [the] Agreement" is defined in Article XII of each HIA to be dates certain; the Agreement may be "terminated, modified, changed or continued" in the same manner as provided in Article Sixteen of the current CBA. (1989 HIA, Art. XII, p. 15; 1992 HIA, Art. XII, p. 14; 1995  HIA, Art. XII, p. 14).

8. Termination language also appears in Exhibit A to each HIA, which Exhibit describes the basic hospital, surgical, and medical benefits to which the retirees are entitled; Exhibit A explicitly states, in its "Termination of Coverages" section, that "the coverages provided under this Exhibit A terminate on the date that . . . the Agreement is terminated." (*See, e.g.,* 1989 HIA Ex. A, Sec. II, Part M, subpart 2(e), pp. 65-66).

9. Such duration and termination language establishes, as a matter of law, that benefit entitlements expire with the agreement. *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 482 (7th Cir. 2006); s*ee also*, *Rossetto*, 217 F.3d at 547 ("If the agreement makes clear that the entitlement expires with the agreement, as by including such a phrase as "during the term of this agreement," then, once again, the plaintiff loses as a matter of law unless he can show a latent ambiguity by means of objective evidence."); *Barnett v. Ameren Corp.*, 436 F.3d 830, 834 (7th Cir. 2006) (holding that the language "for the life of the Labor Agreement" limited the duration of the benefits provided); *Pabst Brewing Co. v. Corrao*, 161 F.3d 434, 443 (7th Cir. 1998) (holding that the phrase "[f]or the term of this Agreement" limited the company's obligations to that particular agreement and allowed it to terminate retiree health insurance benefits upon its expiration); *Murphy v. Keystone Steel & Wire Co.*, 61 F.3d 560 (7th Cir. 1995).

10. Reservation of rights language preserving the company's ability to modify or terminate benefits, like that present here, also precludes vesting. *Vallone,* 375 F.3d at 634 (limiting the interpretation of "lifetime" as "lifetime subject to change" in cases in which there is a reservation of rights clause and stating that "the 'lifetime' nature of a welfare benefit does not operate to vest that benefit if the employer reserved the right to amend or terminate the benefit"); *Int'l Union of United Automobile, Aerospace & Agricultural Implement Workers of America, U.A.W. v. Rockford Powertrain, Inc.*, 350 F.3d 698 (7th Cir. 2003).

11. Because the parties would from time to time negotiate changes to current retiree benefits, such course of dealing establishes that both DTP and the union understood that health insurance benefits were not guaranteed for life. *Cherry,* 441 F.3d at 483 (observing that "the parties' practice of changing the contractual terms in succeeding agreements lends support to [the company's] claim that neither party understood the benefits to be permanent or inalterable") *citing Corrao*, 161 F.3d at 442.

12. The Union was on notice that DTP did not consider retiree benefits vested, as acknowledged in Exhibit 3 to the 1990 ACME; yet it did not bargain for inclusion of explicit language guaranteeing retiree benefits for life.

13. Because the Union made no effort during collective bargaining to secure lifetime benefit guarantees, the Court will not create them now. *Rockford Powertrain*, 350 F.3d at 704; *Rossetto*, 217 F.3d at 544 (laying responsibility on unions for negotiating lifetime benefits, stating, "[a]s word of the *Bidlack* presumption [against vesting] spreads and collective bargaining agreements are renegotiated, it will become obvious to unions that if they want to assure that employer-paid health benefits for the workers they represented are vested, they will have to insist on explicit language to this effect."); *Cherry*, 441 F.3d at 486 ("Union representatives must be mindful of their responsibility to deliver the benefits they have promised and not guarantee benefits they have failed to obtain through explicit contractual language.").

14. Because bargaining over retiree health insurance benefits is a permissive, not mandatory, subject of bargaining, *Allied Chemical and Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 30 L. Ed. 2d 341, 92 S. Ct. 383 (1971), DTP's changes could be unilaterally implemented without breaching any of the contracts then in effect. *Id.* at 185-86 ("Accordingly, just as § 8(d) defines the obligation to bargain to be with respect to

mandatory terms alone, so it prescribes the duty to maintain only mandatory terms without unilateral modification for the duration of the collective-bargaining agreement.").

15. DTP's past practice of bargaining about retiree benefits—a permissive subject of bargaining—does not convert that subject into a mandatory one. *Allied Chemical and Alkali Workers of Am., Local Union No. 1*, 404 U.S. at 187 ("By once bargaining and agreeing on a permissive subject, the parties, naturally, do not make the subject a mandatory topic of future bargaining."); *see also Murphy*, 61 F.3d at 567 (rejecting the retirees' argument that the health care plan at issue could only be changed through bilateral negotiations).

16. DTP's past practice of providing retirees with healthcare benefits does not prohibit DTP from modifying the benefits now. *Barnett,* 436 F.3d at 835 (citing *In Re Unisys Corp. Retiree Med. Benefit "ERISA" Lit.,* 58 F.3d 896, 906 (3d Cir. 1995)).

17. DTP did not breach any contractual obligations when it unilaterally modified retiree health insurance benefits in 2006; thus, the Court will enter a judgment declaring that DTP lawfully amended the retirees' health insurance in 2006.

18. DTP has the right to modify or terminate retiree health insurance benefits at any time under the terms of the controlling documents; thus, the Court will enter a judgment declaring that under the language of the applicable agreements, DTP may amend or terminate retiree health insurance at any time.

Respectfully submitted,

Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

By: \_s/ Kim F. Ebert_____
     Kim F. Ebert, #6649-49
     Kenneth B. Siepman, #15561-49
     Kristin B. Keltner, #20956-53

     Attorneys for Plaintiff, BorgWarner
     Diversified Transmission Products Inc.

111 Monument Circle, Suite 4600
Indianapolis, Indiana 46204
Telephone: (317) 916-1300
Facsimile: (317) 916-9076
kim.ebert@ogletreedeakins.com
kenneth.siepman@ogletreedeakins.com
kristin.keltner@ogletreedeakins.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing has been filed electronically, this 28th day of December, 2007. Notice of this filing will be sent to UAW Local 287 by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Further, I certify that a copy of the foregoing has been served this 28th day of December, 2007 via U.S. Mail, First Class Postage prepaid on the following:

Gerald Poor
2800 West Memorial Drive, Lot 207
Muncie, IN  47302

Eugene J. Winningham
199 Webb Winningham
Jamestown, TN  38586

James L. Kelley
170 Maple Drive
Scottsville, KY  42164

Larry Bradburn
1809 N. CR 397 E.
Muncie, IN  47303

John W. Fennimore
1532 N. CR 563 E.
Selma, IN  47383

Ralph K. Smith
6550 W. 1070 N.
Gaston, IN  47342

Max Van Ulzen
2026 S. Hackley St.
Muncie, IN  47302

Terry Garriott
408 N. CR 563, RR 2
Selma, IN  47383

Don Hobbs
1835 E. 21st Street
Muncie, IN  47302

Bobby Guess
1415 S. Brotherton Street
Muncie, IN  47302

Willard Sloan
2858 N. Sherman Drive
Luddington, MI  49431

Bob L. Bertram
910 Guthrie Chapel
Burkesville, KY  42717

Jim Barrett
550 N. Meridian Street
Redkey, IN  47373

James A. Clark
1409 Italiano Drive
Muncie, IN  47304

Earl F. Herron
809 N. 600 E.
Selma, IN  47383

Larry Terrell
4216 Maple Manor Parkway
Muncie, IN  47302

Doran C. Kendall
3813 W. 11th Street
Muncie, IN  47302

Keith Moses
9660 N. CR 425 E.
Albany, IN  47320

Johnny Massey
6431 S. CR 700 W.
Yorktown, IN  47396

_s/ Kim F. Ebert_____
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

5387446.1